*NOT FOR PUBLICATION*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION

------------------------------------------------------------X

In re

Chapter 7

SHELTON C. LINDSAY,                           Case No. 06-36352 (CGM)

        Debtor.

------------------------------------------------------------X

Paul L. Banner, Trustee,                      Adv. Proc. No. 08-9091
(CGM)

        Plaintiff

- against -

SHELTON C. LINDSAY, LINDA C. LINDSAY,
SHELTON P. LINDSAY, and DOE I, being an entity
or entities who received transfers and whose identity
if currently unknown to the Trustee,

        Defendants.

------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## A P P E A R A N C E S :

Leigh Hoffman
DEILY, MOONEY & GLASTETTER, LLP
8 Thurlow Terrace
Albany, NY 12203
*Attorneys for Plaintiff Paul L. Banner, Chapter 7 Trustee*

Thomas Genova, Esq.
GENOVA & MALIN
Hampton Business Center
1136 Route 9
Wappingers Falls, NY 12590
*Attorneys for Defendant Shelton C. Lindsay*

Lance Portman, Esq.
McCABE & MACK, LLP
63 Washington Street
Poughkeepsie, NY 12601
*Attorneys for Defendants Linda C. Lindsay*
*And Shelton P. Lindsay*

Lillian S. Weigert, Esq.
GELLERT & KLEIN, P.C.
75 Washington Street
Poughkeepsie, NY 12601
*Attorneys for Lee Kalish, Party in Interest*

Leonard Benowich, Esq.
BENOWICH LAW, LLP
1025 Westchester Avenue
White Plains, NY 10604
*Attorneys for Rock City Sound, Party in Interest*

Gary Kushner, Esq.
FORCHELLI, CURTO, DEEGAN, SCHWARTZ,
MINEO, COHN & TERRAN, LLP
333 Earle Ovington Boulevard
Suite 1010
Uniondale, NY 11553
*Attorneys for Barbara Alesi, Party in Interest*

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

 The Court considers a motion for summary judgment by the chapter 7

trustee, seeking the recovery of the value of Debtor's house, Debtor's share in a

joint savings account, Debtor's share of certain stocks, and cash given to a university. The Court finds that the transfers were made with constructive intent to defraud pursuant to New York Debtor and Creditor Law. The Court finds that the Plaintiff did not prove actual intent to hinder creditors by clear and convincing evidence, and does not award attorney fees or pre-judgment interest.

The Court finds that the transfers were made without fair consideration, which causes the burden of proof to shift to the transferee to demonstrate solvency. Defendants have not presented any relevant evidence to meet this burden.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. A proceeding to determine, avoid or recover fraudulent conveyances is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(H).

## SUMMARY JUDGMENT STANDARDS

Pursuant to Fed. R. Civ. P. 56(c) (applicable to this adversary proceeding by Fed. R. Bankr. P. 7056), summary judgment should be granted to the moving party if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (quoting Fed. R. Civ. P. 56(c)). A movant has the initial burden of establishing the absence of any genuine issue of material fact. *Id*. at 322-23. "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *In re CIS Corp.*, 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997).

### *Background*

According to the complaint filed on December 5, 2008 (the "Complaint"), Shelton C. ("Debtor") filed for Chapter 7 bankruptcy on Dec. 8, 2006. He and Defendant Linda Lindsay are married. Shelton P. (the "Son") is their adult son. Plaintiff alleges that they live together in Rhinebeck, New York.

Plaintiff seeks to recover the transferred assets under New York State Debtor and Creditor statutes that permit recovery in circumstances of constructive and actual fraud.

Shelton C. filed an answer on July 27, 2009; Linda and Shelton P. filed an answer on July 28, 2009. The scheduling order was extended at least once in this case, with discovery to be completed by March 2, 2010.

## UNDISPUTED FACTS

Plaintiff's summary judgment motion included the statement of undisputed facts required by Local Bankruptcy Rule 7056-1(b). In turn, the Debtor submitted the response required by Local Bankruptcy Rule 7056-1(c). The Defendants admit the following of the Plaintiff's separately numbered factual contentions, citations to documents are omitted:

3. At the time of Debtor's filing a petition in bankruptcy, Debtor resided at 50 Oak Street, Rhinebeck, New York ("Oak St.")

5. At the time of Debtor's petition in bankruptcy, Oak St. was owned by Debtor's wife, Linda C. Lindsay.

….

12. On or about February 19, 2004, Kalish sought to withdraw from RCS … and on August 31, 2004, Kalish commenced an action against Debtor.[1]

13. On December 10, 2004, Justice Thomas J. Dolan issued an Order restraining Debtor from disposition or exercising any dominion or control over Kalish's shares of RCS stock pending resolution of the state court action.[2]

….

17.  The Linda C. Lindsay Irrevocable Trust is the managing member of Syntonic LLC.

18. The Debtor caused RCS to sell additional assets, computer and office equipment to Syntonic Design Group LLC for $23,649.00.  Syntonic Design Group LLC is a New York corporation formed on June 5, 2005, which is owned by Syntonic LLC.[3]

….

---

[1] Kalish was the 50 percent shareholder of Rock City Sound ("RCS), a corporation that provided audio services for corporate events.  Debtor owned the other 50 percent of the shares. Defendants dispute that Kalish sought to withdraw "pursuant to its bylaws," which is not relevant in the matter at bar.  Defendants dispute that the state-court action was for money damages, arguing that the complaint demanded judgment "specifically enforcing the provisions of the Shareholders Agreement for the disposition of his shares upon withdrawal as a shareholder."  As discussed herein, the action was for money damages, because the plaintiff in that action was seeking money as relief.

[2] Defendants qualify this admission by including the language of the injunction: "Plaintiff is granted a preliminary injunction enjoining Defendant, their principals, agents, and assigns, and any person acting in concert with them from exercising any dominion or control over, committing any act upon, and/or effectuating any conveyance, transfer, assignment or encumbrance, sale or disposition of Plaintiff's 60 shares in ROCK CITY SOUND, INC. pending the resolution of this action."

[3] Defendants allege that the purchase price was a fair price and the proceeds were used to pay existing debt of RCS.

23.  Debtor's schedule A lists the value of 50% of the RCS stock as $1.00 as of the date of the bankruptcy filing.

24.  Defendant Linda C. Lindsay was aware of the lawsuit …[4]

25.  This Court previously granted summary judgment to Kalish in this case, Adv. P. No. #07-9025, finding the $1,154,580.00 contempt judgment owned by Debtor to Kalish to be non-dischargeable.

26.  Debtor maintained a joint bank account with his wife at Rhinebeck Savings Bank bearing account no. [X].[5]  On June 29, 2004, $220,000.00 was transferred from the joint savings account to Linda Lindsay's savings account no. [Y].  Subsequent to this transfer, Linda Lindsay transferred $210,635.00 into another individual savings account no. [Z] on November 1, 2004, bearing only her name.

28. On August 31, 2006, Debtor sold his 2003 Mini Cooper, VIN #WMWRE33483TD65540 to 1-800-Carcash and received $12,500.00. Debtor transferred those funds to St. Andrews via Citicard for payment of his son's tuition.

29. On September 1, 2006, Debtor sold his BMW motorcycle to his tenant, Richard Pearson and received $2,500.00. Debtor transferred those funds to St. Andrews via Citicard for payment of his son's tuition.

30. The Debtor owns a 2001 Goldrush Trailer VIN #1G9T32J2X11227114.

31. The Debtor encumbered the 2001 trailer with a lien in favor of Rhinebeck Savings Bank pursuant to a Note, Disclosure and Security dated

---

[4] Defendants dispute this paragraph, stating, "While Linda was aware of the lawsuit by Kalish for specific performance of the Shareholder's Agreement, she was not aware of the specifics of any 'negotiations.'"  Negotiations with Kalish are immaterial in the matter at bar.

[5] Account numbers are redacted to protect the parties' privacy.

September 1, 2006. The Debtor received $20,055.00 from the loan
proceeds.

32. The Debtor deposited the Rhinebeck loan proceeds into his
checking account to pay tuition at St. Andrews on behalf of his son,
defendant Shelton P. Lindsay.[6]

33. The Court paraphrases this paragraph to summarize a chart
Plaintiff submits: Debtor transferred various stock interests in 14 transfers,
from October 18, 2004, to June 30, 2005.

34. Debtor owned all of these stocks jointly with his wife, Linda
Lindsay, with the exception of the Seligman Growth Fund which was owned
individually by the Debtor.

## DISPUTED FACTS

The Defendants dispute the following of the Plaintiff's separately numbered
factual contentions, citations to documents are omitted:

2. Debtor had a successful liver transplant on May 29, 2003. Debtor's
health had not deteriorated in any meaningful way to prompt estate planning
from 2004-2006.

► Disputed. Plaintiff takes Defendant Linda's testimony that
[Debtor's] health had not deteriorated any more than it was deteriorating to
stand for a false assertion of fact, namely that his health was not
deteriorating. From the false statement of fact, Plaintiff contends that
without deteriorating health the parties would not be doing anything in 2004-
2006 for estate planning. This is both false in logic and in fact. As set forth

---

[6] Defendants admit the allegations of ¶¶ 28, 29, and 31, and add the following statement to the
admission: "Fair consideration was obtained for the [property] and the proceeds were used to pay
Son's education, an existing debt for which he was responsible."

in Shelton's Affidavit … and as set forth in Linda's Affidavit … Shelton's health is constantly deteriorating. Succession planning for the business Rock City began in 1998 and estate planning began in 2002.

….

4. Debtor acquired Oak Street in approximately 1975. Debtor acquired the property in his name individually and the property remained in his name individually until he transferred it to his wife by Deed dated August 24, 2004, and recorded November 16, 2004, in the Dutchess County Clerk's Office. Debtor received no consideration for the transfer of Oak St. to his wife.

► Disputed as to the assertion that there was no consideration and that Linda had no interest in the property prior to the August 24, 2004 Deed. These are conclusions of law and not statements of fact. Shelton and Linda were married on November 20, 1982, and the home located at 50 Oak Street, Rhinebeck, New York has been their marital and family home since then. As set forth in the Affidavits, taxes, insurance, improvements, maintenance and repair to home have been jointly paid by Shelton and Linda. Several mortgages encumbering the house were repaid jointly. A mortgage from American Airlines Employee Federal Credit Union on the home was repaid through payroll deductions from Linda's salary as an employee of American Airlines.

….

14. In June 2005, Debtor, as sole director and president of RCS, took for himself a proxy authorizing him to vote all of Kalish's shares and declared that RCS had no obligation to purchase Kalish's shares under his notice of withdrawal. It was with this proxy the Debtor authorized the liquidation of RCS assets.

► Disputed. It was not with this proxy that the Debtor authorized the liquidation of RCS assets.

15. On June 5, 2005, Debtor violated Judge Dolan's December 10, 2004 preliminary injunction order and caused RCS to sell its valuable inventory to H.T.I.C.S., and equipment broker, for $745,834.24. (See Hoffman Aff. ¶17).

► Disputed. Judge Dolan's December 10, 2004 order did not restrain the disposition of assets. The order only addressed Kalish's shares. RCS sold certain equipment to H.T.I.C.S. for the sum of $770,452.11. This was a fair price for the equipment and all of the proceeds were used to pay existing debt of RCS. (See, Shelton Affidavit at ¶¶16 & 17).[7]

16. This same equipment was thereafter purchased by Syntonic LLC for the sum of $772,452.00. The Linda C. Lindsay Irrevocable Trust owns 45% of Syntonic LLC. The Debtor is the trustee of this trust.

► Disputed. Syntonic purchased the equipment from H.T.I.C.S. for the sum of $745,834.24. Bank loans were used for this purpose. The purchase price was a fair price for the equipment.

….

19. As a result of the transfer and sale of RCS assets, Justice Dolan found the Debtor in contempt of the December 10, 2004 preliminary injunction order, and issued a Contempt Judgment on August 11, 2006 assessing actual damages of $1,145,580.00 against Debtor.

► Disputed. Shelton was found in contempt based on his exercise of dominion or control over Kalish's shares of stock in RCS. (See, Exhibit "15" to Plaintiff's motion for summary judgment). The assessment of actual

---

[7] Defendant's responses to ¶¶ 14 and 15 – at least – appear to have been rejected by Judge Dolan, of the Justice of the New York Supreme Court, in his August 11, 2006 decision.

damages in the amount of $1,145,580.00 against Shelton represented the value of Kalish's 50% shares of stock of RCS.

20. An appeal was taken and abandoned by Debtor. The remaining assets in RCS were outdated and had inconsequential value.

►Disputed. The remaining assets in RCS were not of inconsequential value [as shown by documents detailing the remaining assets of RCS with a value of $1,605,885.22].

21. The transfers left RCS and Debtor with unreasonably small capital.

►Disputed. This is a legal conclusion and not a statement of fact. The "transfers" did not leave RCS and Debtor with "unreasonably small capital".

22. The State Court determined the actions taken by Debtor rendered the RCS stock worthless.

►Disputed. This was not a Finding of Fact by the State Court.

From the foregoing allegations of fact and responses, the Court discerns the following timeline of events:

1. 1975 – Debtor buys Oak St.

2. November 20, 1982 – Debtor and Linda marry.

3. August 2002 – Debtor begins estate planning.

4. May 29, 2003 – Debtor undergoes a liver transplant and survives the operation.

5. February 19, 2004 – Kalish seeks to withdraw from RCS.

6. June 29, 2004 – Debtor transfers $220,000 from a joint bank account to Linda's savings account.

7. August 24, 2004 – Debtor transfers his interest in Oak Street to Linda by deed.

8. August 31, 2004 – Kalish sues Debtor and RCS, seeking specific performance of the bylaws for the disposition of the shares.

9. October 18, 2004 – Debtor begins transferring stock to Linda; the last transfer is made on June 30, 2005.  The value of Debtor's interest in the transferred stock was $283,019.51.

10.  November 16, 2004 – The Oak Street Deed is recorded.

11. December 10, 2004 – Debtor is enjoined from disposing of Kalish's shares.

12. June 5, 2005 – Debtor sells RCS inventory to HTICS, which was later purchased by Syntonic LLC, an entity owned in part by the Linda C. Lindsay Irrevocable Trust.  Also on June 5, 2005, Syntonic Design Group LLC is formed, which is owned by Syntonic LLC. Debtor sells Syntonic design other RCS assets.

13. August 11, 2006 – Judge Dolan of the Dutchess County Supreme Court finds Debtor in contempt of the December 10, 2004 injunction, and assesses actual damages against Debtor and in favor of Kalish in the amount of $1,145,580.00.

14. August 31, 2006 – Debtor sells a Mini-Cooper and receives $12,500, which is used for tuition.

15. September 1, 2006 – Debtor sells a BMW motorcycle and receives $2,500, which is used for tuition.  Also on September 1, 2006, Debtor encumbers a trailer with a lien, and receives $20,055 from the transaction, which is used for tuition.

16. December 8, 2006 – Debtor files for bankruptcy and Plaintiff is appointed trustee.

The issue is whether the transfers of the money in the joint account, the house, the stocks, and the proceeds of the vehicle transactions constitute fraudulent

transfers.  Plaintiff alleges that the transfers constitute a broad effort to hinder or defraud creditors.  Defendants allege that the transfers were proper transactions related to estate planning, and to satisfy an obligation to pay the Son's college tuition.

### *Rules and Legal Standards*

Bankruptcy Code § 544 provides that the trustee may avoid a transfer of a debtor's property interest "that is voidable under applicable law" by a creditor holding an allowed unsecured claim.  11 U.S.C. § 544. This section of the Bankruptcy Code allows the trustee to rely on state law.  *See Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 158 (E.D.N.Y. 2000).  Here, the trustee may rely on the New York version of the Uniform Fraudulent Conveyance Act, which has a statute of limitations of six years and allows trustees the choice of proving constructive or actual fraud.  *See id.*

Generally, the New York Uniform Fraudulent Conveyance Act is set forth in DEBT. & CRED. §§ 270-81.  These statutes characterize various transfers as actually or constructively fraudulent.  In showing constructive fraud, the intent of the parties is generally irrelevant.  *In re Corcoran*, 246 B.R. at 159.  Generally, a transfer is a constructive fraudulent conveyance if it is made without fair consideration as defined by DEBT. & CRED. § 272, and

> ● the transferor will be rendered insolvent (DEBT. & CRED. § 273);
>
> ● the transferor is engaged in business and will be left with unreasonably small capital (DEBT. & CRED. § 274);
>
> ● the transferor intends or believes that he or she will incur debts beyond his or her ability to pay them as they mature (DEBT. & CRED. § 275); or
>
> ● the transfer is when the transferor is a defendant in an action for money damages or a judgment has been docketed against the

transferor and the transferor has failed to satisfy the judgment (DEBT.
& CRED. § 273-a).

*See Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 81-84 (Bankr.
E.D.N.Y. 2007).[8]

As stated in *Ackerman*, discussed herein, "fair consideration" requires: 1. the
recipient either conveyed property in exchange or discharged an antecedent debt in
exchange; 2. such exchange is the "fair equivalent of the property received;" and 3.
such exchange was made in good faith. *Id*. at 82.

Bankruptcy Code § 548(a) allows the avoidance of two general types of
fraudulent transfers. First, transfers made with "actual intent" are avoidable under
Section 548(a)(1)(A). Constructively fraudulent transfers are avoidable under
Section 548(a)(1)(B) and do not require proof of fraudulent intent.[9] BAPCPA

---

[8] The following statutes address constructive fraud:

Debt. & Cred. § 273-a provides: "**Conveyances by defendants:** Every conveyance made
without fair consideration when the person making it is a defendant in an action for money
damages or a judgment in such an action has been docketed against him, is fraudulent as to the
plaintiff in that action *without regard to the actual intent of the defendant* if, after final
judgment for the plaintiff, the defendant fails to satisfy the judgment" (emphasis added).

Debt. & Cred. § 273 provides: "**Conveyances by insolvent:** Every conveyance made and
every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent
as to creditors *without regard to his actual intent* if the conveyance is made or the obligation
incurred without a fair consideration" (emphasis added).

Debt. & Cred. § 378 provides:
**Rights of creditors whose claims have matured**
1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor,
when his claim has matured, may, as against any person except a purchaser for
fair consideration without knowledge of the fraud at the time of the purchase, or
one who has derived title immediately or mediately from such a purchaser,
a. Have the conveyance set aside or obligation annulled to the extent necessary to
satisfy his claim, or
b. Disregard the conveyance and attach or levy execution upon the property
conveyed.

[9] 11 U. S. C. § 548(a)(1)(B) provides:

extended the reach of Section 548(a) to transfers that were made or incurred within two years before the date of the filing of the petition. Previously, Section 548(a) applied to transfers made within one year prior to the filing of the petition.

In the Second Circuit, actual fraud may be ascertained by reviewing the following "badges of fraud":

1. lack or inadequacy of consideration;

2. family relationship between the parties;

3. retention of possession, benefit or use of the property by the debtor;

4. the financial condition of the transferor before and after the transfer in question;

5. a pattern of transactions or conduct after the debt is incurred, the onset of financial difficulties, or threat of suits by creditors; and

6. the chronology of the events and transactions.

*Ackerman*, 362 B.R. at 81.

---

The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily

(B)(i)    **received less than a reasonably equivalent value** in exchange for such transfer or obligation; **and**

(ii)    (I) **was insolvent** on the date that such transfer was made or such obligation was incurred, **or became insolvent as a result** of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an **unreasonably small capital**;

(III) **intended to incur**, or believed that the debtor would incur, **debts** that would be **beyond the debtor's ability to pay** as such debts matured; **or**

(IV) made such transfer **to or for the benefit of an insider**, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

(emphasis added).

"Fair consideration" requires: 1. the recipient either conveyed property in exchange or discharged an antecedent debt in exchange; 2. such exchange is the "fair equivalent of the property received;" and 3. such exchange was made in good faith. **The burden of proof shifts from the plaintiff to the defendant where the facts regarding the nature of the consideration are in the defendant's control, and in an intra-family transfer where there is an absence of tangible consideration.** *See Ackerman*, 362 B.R. at 82 (emphasis added). A promise of future support is not considered a fair equivalent of property transferred. *See id.* at 83.

"Under well-settled New York law, a voluntary conveyance made while a debtor is indebted to creditors is presumptively fraudulent." *Id.* The transferor must present evidence of solvency. *Id.*

In the case at bar, the burden of proof shifted to the Debtor to show fair consideration. The facts surrounding the consideration are in the Debtor's control: The house was in Debtor's name, the Debtor's name was on the joint bank account and stocks, and Debtor appears to have run the family business, RCS. Further, the transfer was between family members, with the consideration being summarized as "estate planning."

The Court notes that the parties dispute the valuation of Oak St. Plaintiff uses an appraisal and Linda's deposition testimony to arrive at a valuation of $550,000 or $555,000. Defendants allege that according to other valuations, the house was worth $349,000 or $409,000.[10] The valuation is immaterial at this time, because it does not go toward determining whether the transfer was a fraudulent transfer.

---

[10] Defendants reference a third valuation of "$399.00." Defendants have not submitted proof in support of their alternate valuations, including for this one, which sets the property as almost worthless.

### *The transfer of Debtor's interest in the house and the joint savings account was fraudulent pursuant to Debt. & Cred. § 273*

Transfers made without fair consideration are presumed to leave the transferor insolvent. *In re Corcoran*, 246 B.R. at 163; *In re Borriello*, 329 B.R. 367 (Bankr. E.D.N.Y. 2005). The burden shifts to the transferee to present evidence of the debtor's continued solvency. *Corcoran*, 246 B.R. at 163.

As stated above, "fair consideration" requires: 1. the recipient either conveyed property in exchange or discharged an antecedent debt in exchange; 2. such exchange is the "fair equivalent of the property received;" and 3. such exchange was made in good faith. In the matter at bar, Defendants admit the transfer, and deny it was for no consideration, claiming consideration is a legal issue. The Court finds that Debtor received nothing when he transferred his house to his wife; therefore, the first two elements are not satisfied. Defendants assert that the transfers were made as part of the estate planning process; if this were true, then it may be found that the exchange was made in good faith.

The Court finds that the conveyance of the house was not made for fair consideration. The Plaintiff has met his burden of proof of preponderance of the evidence, pursuant to DEBT. & CRED. § 273. He has presented proof of the transfer, including a deed describing the transfer as "one dollar and other good and valuable consideration." The Plaintiff has presented an appraisal, which demonstrated the property to be worth $555,000 as of December 8, 2006. Linda Lindsay has not presented any evidence of consideration, alleging only that the transfer was made as part of "estate planning," and that she had helped pay the mortgages and other costs over the course of their marriage.

The Court notes that Defendants have not produced legal support for their argument that estate planning is a defense to sections of the Debtor and Creditor Law regarding fraudulent transfers. This argument was necessary, because it is

well established that promises of future support are not fair consideration. *See, e.g., Ackerman*. If a parent may not give property to a child in exchange for future support from the child, it is hard to see how a parent or spouse could give property to adults for their benefit after the transferor's death. The Court further notes that no actual proof of estate planning was presented other than a letter from an attorney, asking the Defendants to make an appointment to discuss estate planning. It would have been helpful to Defendants to have presented such a document as a will, trust accounts, or proof of life insurance or long-term disability insurance.

Additionally, for purposes of defending a fraudulent transfer, Defendants have not made a legal argument in support of their suggestion that Linda's payment of housing costs over the years caused her to develop a legal interest in the house. This argument, if plead, would have been undermined by the fact that Debtor transferred his interest in the house by deed to Linda.

"Since the transfer lacked fair consideration, it is a fraudulent conveyance if it occurred when the debtor was insolvent or was made insolvent by the transfer. When property is transferred for less than fair consideration, it is presumed the transfer made the transferor insolvent." *Borriello*, 329 B.R. at 376. "The burden then falls on the defendant to rebut the presumption of insolvency." *Id.* Linda Lindsay has failed to rebut the presumption of insolvency. The only proof of solvency seems to be the "price check," the list of RCS' assets. As discussed herein, if the value of RCS' assets is probative of Debtor's solvency, the price check is not sufficient to meet the Defendants' burden on summary judgment to challenge a material fact, here that the assets of RCS were of inconsequential value. Linda Lindsay has not countered the presumption that the transfer of the house made Debtor insolvent.

In *Borriello*, cited *supra*, debtor transferred his half-interest in his house to his wife about four years before filing for bankruptcy. The plaintiff trustee

produced evidence of insolvency, including proof that debtor's liabilities exceeded
his income, and dueling valuations of the debtor's businesses.  Debtor failed to
effectively rebut this evidence.  The court held that the plaintiff trustee could
recover the value of the transferred interest pursuant to DEBT. & CRED. §§ 273, 275
and 278.

In the case at bar, the Court holds that the trustee may recover the value of
Debtor's interest in the house and the Debtor's share of the joint savings account
pursuant to DEBT. & CRED. § 273; the Court need not perform an analysis of DEBT.
& CRED. §§ 275 or 278, or the doctrine of collapse, for purposes of determining
that these two assets were transferred with constructive intent to defraud.  Linda
Lindsay paid no consideration and satisfied no debt to her husband in exchange for
the house and savings.  Regarding the transfers being made in good faith, the Court
notes that Debtor and Linda married in 1982; Debtor contracted hepatitis C in
1982, and his health deteriorated to the point of needing a transplant in the later
1990s; and estate planning was commenced in 2002.  Considering this
extraordinary timeline, the Court cannot overlook the fact that the Debtor's most
significant asset, his home, was not transferred until twenty-two years after he first
fell ill, two years after estate planning commenced, and just one week before he
was sued by his business partner.  The savings were transferred to Linda's
individual savings account just two months before the state court action was
commenced; the Court notes that the money was transferred from a joint savings
account, which presumably had a right of survivorship.  Defendants have repeated
that the transfers were part of estate planning, and have not argued why the savings
and jointly-held stocks would not have passed automatically upon Debtor's death
to Linda, his joint tenant.

Defendants have failed to produce proof of fair consideration or Debtor's
solvency.  Therefore, the Defendants must turn over to the Plaintiff $110,000,

representing Debtor's interest in the money transferred from the joint savings
account.  The exact value of the house is not a material fact for purposes of
summary judgment – Defendants cite an alternate appraisal by the Plaintiff that
found the house was worth $379,000, and a "full market assessment" done by the
municipality in the amount of $409,000.  The Court is satisfied that the value of the
house is far greater than the nominal consideration described in the deed.  A
separate hearing will be held to determine the value of the house.

### *Debtor's transfer of stock was fraudulent*

Defendants admit that Debtor transferred his interest in the stocks to Linda
Lindsay.

Debtor was a defendant in an action for money damages when he transferred
the stocks to his wife.  It is irrelevant that the technical relief was specific
performance – Kalish's remedy was cash for his shares, once the valuation of the
company was established.  "Almost invariably, suits seeking (whether by
judgment, injunction, or declaration) to compel the defendant to pay a sum of
money to the plaintiff are suits for 'money damages,' as that phrase has
traditionally been applied, since they seek no more than compensation for loss
resulting from the defendant's breach of legal duty. … And money damages are, of
course, the classic form of legal relief."  *Great-West Life & Annuity Ins. Co. v.
Knudson*, 534 U.S. 204, 210 (2002) (denying plaintiffs equitable remedies pursuant
to ERISA) (citations omitted).  Therefore, the Defendants must turn over to
Plaintiff the value of Debtor's interest in the stocks.

### *Payment of a child's college tuition is not a defense to transfers that are presumed to be fraudulent.*

Defendants admit that they transferred proceeds of certain assets sales to a
university for their son's education.  The Court notes at the outset that Defendants
produce no evidence of their alleged legal obligation to pay their son's tuition,

such as a promissory note in favor of the university or a lender.  The Court is not aware of any law requiring a parent to pay for a child's college education.

Defendants do not offer any authority in support of their argument that a judgment debtor's "moral obligation" to pay for a child's college education is a defense to DEBT. & CRED.  § 273-a.  In fact, in *In re Godios*, 333 B.R. 644 (Bankr. W.D.N.Y. 2005), the bankruptcy court dismissed the chapter 7 debtors' joint case for substantial abuse, where the debtors admitted that the purpose of the case was to better position themselves to pay for their twins' college education.  By eliminating retirement and college costs, the debtors could have funded a 100 percent chapter 13 plan in about two years.  *Id.* at 647.  The bankruptcy court rejected the debtor's contention that paying for his children's college education was his "responsibility."  *Id.*

The issue is not whether Debtor transferred the vehicles and encumbered the trailer for fair value.  The issue is whether he permissibly transferred the money received for these assets to the university as tuition for the Son.  The Court holds that the transfer was a fraudulent transfer pursuant to DEBT. & CRED. § 273-a.

Therefore, Defendants must turn over to the Plaintiff $35,055, representing the money used to pay for the Son's tuition.

### *The proof of value of RCS' remaining assets*

Defendants present a voluminous "Price Check" of Rock City Sound, Inc., dated July 31, 2005.  This document is characterized as proof that the remaining assets of RCS were substantial and not of "inconsequential value," as alleged by Plaintiff.  Presumably, the price check is offered to show that either Debtor was solvent, as the 50 percent owner of a company with assets, or that Debtor was not left with unreasonably small capital, as his company had assets.

The Court finds that by relying on the price check, Debtor and Defendants have failed to meet their burden to present evidence to dispute a material fact.

First, Defendants admit that the Debtor listed the value of his interest in RCS as $1 on the schedules filed with his petition. The Court requires proof of Debtor's solvency, such as tax returns, bank statements, or other financial documents. All the wealth Debtor had in the world, to this Court's knowledge, is the subject of the Plaintiff's lawsuit, and most of it had been transferred to his wife at the time of the transfers of the RCS equipment – the house, the savings, the stocks. If Debtor had other assets that would lead to a finding of solvency, then proof of it should have been presented in opposition to the motion for summary judgment.

If the Court were to consider the value of RCS, the price check is not helpful. The Court would have been aided by profit and loss statements, or other documents showing the viability of the company and value of its assets. The price check is a meaningless list of equipment. It tells the Court nothing about the assets of RCS, its income, or its liabilities. Did the company have contracts in place to bring in income? Were its assets encumbered by liens? How many employees did it have? Was it a defendant in other lawsuits? Did it have receivables that could be collected? What were its costs compared with its income? Answering these questions might have persuaded the Court that there was a triable issue of fact that Debtor was solvent as a shareholder of RCS, or that RCS was not left with unreasonably small capital. As it is, Defendants have presented a stack of non-evidence, and claim that there is a disputed fact. Defendants were required to meet a standard of proof, which they have failed to do. As noted above, on a motion for summary judgment, "a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *See also Cadle Co. v. Newhouse*, 2002 WL 1888716 at *5 (S.D.N.Y. 2002 August 16, 2002) ("if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted").

The Court finds that even if the valuation of RCS' assets were relevant to
showing Debtor's solvency or the worth of capital, proof of the value would be
barred by collateral estoppel.  In *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir.
2006),[11] the Second Circuit established the following requirements for application
of the doctrine of collateral estoppel:

> (1) the identical issue was raised in a previous proceeding; (2) the
> issue was actually litigated and decided in the previous proceeding;
> (3) the party had a full and fair opportunity to litigate the issue; and
> (4) the resolution of the issue was necessary to support a valid and
> final judgment on the merits.

Principles of collateral estoppel apply to decisions by other courts of competent
jurisdiction, including state courts. *See Evans v. Ottimo*, 469 F.3d 278, 282 (2d Cir.
2006).

For the first element of analysis, complete identity need not exist to invoke
collateral estoppel.  *Greene v. United States*, 79 F.3d 1348, 1352 (2d Cir. 1996)
(applying *Montana v. United States*, 440 U.S. 147 (1970)). The Court may employ
a three-part test to determine whether a litigant is collaterally estopped from
litigating an issue.  *Id.*  The Court must decide 1. whether the same issues
presented by the second litigation are in substance the same as those resolved in
the first litigation; 2. whether controlling facts or legal principles have changed
significantly since the initial decision; and 3. whether other special circumstances
warrant an exception to the normal rules of preclusion.

The Court finds that the Defendants are estopped from presenting evidence
of the value of the leftover equipment.  In the state-court action, Judge Dolan

---

[11] In the *Ball* case, the Second Circuit affirmed the bankruptcy court's ruling that sanctions
assessed by a district court against an attorney under 28 U.S.C. § 1927 (for unreasonably and
vexatiously multiplying proceedings) collaterally estopped the attorney from contesting that the
sanctions award was nondischargeable under Section 523(a)(6).

considered whether Debtor violated an injunction requiring him to protect Kalish's shares. In the matter at bar, the Court is asked to determine whether RCS continued to hold valuable assets; presumably, this is relevant to Debtor's insolvency. The Court finds that these issues are substantially the same – at the core of both is the question of whether there was any value to RCS. Judge Dolan concluded that Debtor destroyed the value of Kalish's shares by "selling off corporate assets and effectively putting the corporation out of business." No party has advised the Court in changes of authority since the Judge Dolan's decision, and no special circumstances are present to warrant an exception to the rules of preclusion.

An issue has been "actually litigated" for collateral estoppel purposes if it was "properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Halyalkar v. Bd. of Regents of State of N.Y.*, 72 N.Y.2d 261, 268 (1988); see also *Evans v. Ottimo*, supra, 469 F.3d at 282-283 (2d Cir. 2006) (state court's entry of default judgment had collateral estoppel effect because it was "grounded in a finding of actual fraud and imposing punitive damages" and thus decisive of all issues necessary to establish nondischargeability under Section 523(a)(2)). The valuation of the assets was core to Judge Dolan's finding that the Debtor destroyed the value of Kalish's shares.

In the state-court action, Judge Dolan found that Debtor granted himself a proxy on June 6, 2005, which authorized him to vote Kalish's shares. Judge Dolan stated that these acts "were the precursor to Lindsay selling off corporate assets and effectively putting the corporation out of business, rendering plaintiff's shares of stock worthless." In finding that Kalish's actual damages were $1,145,580, Judge Dolan noted, "Lindsay's efforts, together with these of [his counsel], to attack this number fall far short of raising an issue of fact requiring a hearing to assess damages." Lindsay appeared in and litigated the state court action. The

value of the assets was necessary to the judgment on the merits, that Debtor destroyed the value of Plaintiff's shares.

In finding the transfers to be constructively fraudulent, the Court is guided by *Ackerman*, cited above, where the chapter 7 trustee prevailed in his fraudulent conveyance action against three generations of Ventimiglias. In *Ackerman,* debtors' family business declined, and they transferred half the ownership to their son, without consideration and leaving no documentary evidence of the transaction. Debtors' newlywed daughter and her husband moved in with the debtors, and stayed for thirteen years, rent-free.

The debtors neglected a judgment creditor. "Jubilee" sued one of the debtors pre-petition, entered a settlement in the amount of about $21,500, and became entitled to enter judgment against her when the debtor defaulted. When the debtors re-financed their mortgage, they paid creditors other than Jubilee. They testified that they gave $25,000 of the money to their son, but the court found insufficient proof of this transfer. Debtors also gave money to their daughter and son-in-law and bought a new car, financing part of that transaction, while continuing to fail to pay Jubilee.

When the debtors sold their home, they transferred $25,000 of the cash to their daughter and son-in-law, which the court found to be a transfer without fair consideration. Then, the debtors moved into their daughter and son-in-law's new home. Debtors testified that they transferred $7,000 to $10,000 to the daughter and son-in-law to make improvements on their home, and a further $20,000 for the purchase of new home when the family moved.

Lastly, the debtors invested in mutual funds for the benefit of their grandchildren, which they claimed were payback of loans borrowed from investments set up for these minors. The court found that the money used to buy the mutual funds were transfers without consideration.

Eventually, after default by the debtors, Jubilee entered judgment, and the debtors filed for bankruptcy two years later.

The court considered the badges of fraud for purposes of finding actual intent to defraud, and concluded that the debtors did not have actual intent to defraud for purposes of DEBT. & CRED. § 276, because the transactions were not unusual (buying and selling homes and refinancing), the debtors kept some proceeds of the sale of their home for living expenses, and the debtors lived with their children without paying rent for six years.

The court found that the transfers to the daughter and son-in-law were constructively fraudulent for purposes of the New York Debtor and Creditor law.

### *The trustee did not meet his burden of proof regarding actual intent to hinder, delay or defraud creditors*

Plaintiff seeks relief pursuant to DEBT. & CRED. § 276, which provides that conveyances are fraudulent if made with actual intent to hinder creditors, and DEBT. & CRED. § 276-a, which awards attorney fees.  The Court acknowledges that most of the badges of fraud are present in this case: close family relationship, no consideration given by Linda or the Son, Debtor's insolvency, transfer not in the ordinary course of business, and Debtor's continued use of the house.  *See Cadle Co.*, 2002 WL 1888716 at *5.  The burden of proof of actual intent is clear and convincing evidence.  *Id.*

Here, the Court finds that the Plaintiff has not shown by clear and convincing evidence that there was actual intent to hinder creditors.  The Plaintiff would have prevailed pursuant to these statutes if the burden had been a preponderance of the evidence.  The Court notes that Debtor is a long-time sufferer of liver disease, and has a son whom he wishes to educate.  Wishing to provide for one's family is not the same thought as intending to hinder creditors.  The Court does not find that estate planning or paying for the Son's education were the actual

motives of Debtor and the other Defendants; the Court only finds that the Plaintiff did not meet his burden to produce clear and convincing evidence of actual intent.

### *Motions to quash subpoenas*

Counsel to Kalish, RCS, and RCS' counsel have moved to quash the subpoenas served by Defendants, on the grounds that they are untimely and burdensome.  Movants all allege that the Court extended the scheduling order on the record of a hearing, so that depositions would be concluded by March 2.  The parties claim to have been served with subpoenas that called for depositions on March 25 or 26.

The Court would grant the motions to quash, if they were not moot in light of the foregoing.  Defendants have not argued that Debtor, a principal of RCS who actively participated in litigation regarding his company, is unable to produce the information.  No excuse for the delay and failure to comply with the scheduling order have been offered.

### CONCLUSION

For the foregoing reasons, the Court holds that the transfer of Debtor's house and savings in the amount of $110,000 were fraudulent pursuant to DEBT. & CRED. § 273, and that the transfers of the stocks were fraudulent pursuant to DEBT. & CRED. §§ 273 and 273-a.  The transfers of money to the university as tuition were fraudulent pursuant to DEBT. & CRED. §§ 273 and 273-a.  Defendants have not met their burdens to present proof sufficient to raise a dispute of a material fact and to

present proof of solvency.  The Court does not award attorney fees or prejudgment interest.

A further hearing will be held to determine the value of Debtor's interest in the house.

Counsel to Plaintiff shall submit an order consistent with this decision.

Dated:      Poughkeepsie, New York
            May 4, 2010

                                        /s/ Cecelia Morris
                                        U.S. Bankruptcy Court